**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

LOUIS RYCHWALSKI, JR.                    *

           Plaintiff          *

     v.                    *          Civil Action No. GLR-13-2082

CMS, et al.                    *

          Defendants          *

                       ***

<u>**MEMORANDUM OPINION**</u>

      Plaintiff Louis Rychwalski, Jr. ("Rychwalski") filed the above-captioned Complaint pursuant to 42 U.S.C. § 1983.  Defendants Warden Kathleen Green, Cpt. Robert J. More, William Fisher, Craig Reid, Robert C. McGee, Charles Westbrook, John Bromley, William Maycock, and Paul Ziolkowski ("Correctional Defendants"), Wexford Health Sources, Inc., Correctional Medical Services ("CMS"), Corizon, LLC, Maryam Messforosh, P.A., Jason Clem, M.D., Bruce Ford P.A., Paul Matera, M.D., and Terry Davis, P.A. ("Medical Defendants"), by their attorneys, have filed Motions to Dismiss, or, in the Alternative, for Summary Judgment.[1] ECF Nos. 20, 25, 44, and 50.  Plaintiff has responded.  ECF Nos. 24, 30, 47, 48, 49 & 52.   After review of the pleadings and applicable law, the Court determines that a hearing is unwarranted. <u>See</u> Local Rule 105.6 (D. Md. 2014).  For the reasons that follow, the Motions to Dismiss, construed as  Motions for Summary Judgment, will be GRANTED.

---

[1] The Clerk shall amend the docket to reflect the full and proper spelling of Defendants' names.

**Background**

Rychwalski, an inmate then-confined at the Eastern Correctional Institution ("ECI"), alleges that on February 25, 2012, he was returned to the facility after having undergone foot surgery at an outside hospital.   Plaintiff returned to the facility in a wheelchair and the ECI dispensary issued him crutches but Correctional Officers Fisher, Reed, and McGee allegedly took them.  Then Officers Fisher, Reed, Westbrook, and Moore allegedly wheeled Plaintiff to his cell and told him to get out of the wheelchair.  He advised correctional staff that he needed his crutches.  Moore replied that he did not have time and instructed Plaintiff to either get out or be dumped out.  Plaintiff states that he sat on the floor.  ECF No. 1.

During the next shift he was advised that crutches were a security risk.  Plaintiff states that he told nurses who came to his cell during pill call to notify the physicians' assistants and doctors that he was being denied crutches.  Id.  Plaintiff states that he was afraid he would lose his balance and step on his foot causing himself further injury.  He states he was insulted and humiliated by staff and inmates for crying and begging correctional and medical staff to assist him.  Id.

Plaintiff states that he notified Ziolkowski and Bromley that he had surgery on his great toe to remove screws and have a plate installed.  He states they called medical to verify the necessity of using the crutches but nothing happened.  He was told that he could not have the crutches in his cell as they posed a security risk.  Plaintiff states that he asked to be sent back to medical but no one responded.  Id.  On March 1, 2012, Plaintiff states P.A. Ford asked him why he did not have his crutches and Plaintiff advised that correctional staff said they were a security risk.  Ford indicated that Plaintiff should be in the hospital.  Id.  The following day Plaintiff was

returned to the hospital and provided crutches.  Plaintiff alleges that P.A. Messforosh and CMS released him to a unit where he could not have the prescribed crutches.  Id.  Additionally, he claims that he was forced to hop on one leg for meals and medication for seven days and felt something wrong in his back.  ECF No. 31.  He states that no doctors would do an x-ray which would have shown damage to his back caused by the deprivation of crutches.  Id.

Plaintiff's medical records demonstrate that on February 13, 2012, Plaintiff was admitted to the ECI infirmary in preparation for outpatient surgery on his right foot.  ECF No. 20, Ex. 1. Plaintiff was discharged from the infirmary on February 25, 2012, and brought back to ECI Housing Unit ("HU") 4 to complete his disciplinary segregation sentence.  Id.  Plaintiff was returned to HU 4 in a wheelchair.  His crutches were maintained in the HU Control Center as a security measure.  Ziolkowski avers that crutches can be used to hinder access to the cell or as a weapon in an assault.  The crutches were made available to Plaintiff any time he needed to leave his cell.  Id.  No crutches are permitted in HU 4 cells.  Id., Ex. 2.

Correctional Defendants state that ECI cells are 11 feet by 7 feet.  The toilet and sink are within 2.5 feet of the bunk.  While housed on disciplinary segregation each inmate is fed all three meals in his cell through a slot opening in the door.  To prevent accidental injury while he recovered from his surgery Plaintiff was single celled in HU 4.  Id., Ex. 2.

Plaintiff was admitted to the infirmary, upon direction of the medical department, on March 2, 2012.  Id., Ex. 1.  He was discharged from the infirmary back to HU 4 on March 10, 2012.  At that time he was fitted with a "walking cast" and crutches were available whenever he left his cell.  Id., Ex. 1.

Plaintiff filed an Administrative Remedy Procedure ("ARP") Complaint regarding the denial of his crutches.  Id., Ex. 1.  During the ARP investigation, Dr. Clem was contacted regarding Plaintiff's concerns.  Clem advised that the crutches were not necessary for in-cell use but were to be made available for Plaintiff's use for out-of-cell activity.  Id., Exs. 1 & 3.  Plaintiff appealed the denial of the ARPs.   The ARPs were consolidated and considered by an administrative law judge ("ALJ") who found Plaintiff failed to show an Eighth Amendment deprivation regarding the denial  of crutches from February 25 to March 2.  Id., Ex. 4.  The ALJ also found no violation of the Eighth Amendment for the deprivation of crutches after March 9, when Plaintiff was provided a walking cast.  Id.

Plaintiff's medical records demonstrate that he is a patient enrolled in the chronic care clinic who has a medical and mental health history of depression, psychosis, paranoia, attention deficit hyperactivity disorder, anxiety, artropathy in his shoulder, asthma, esophageal reflux, Hepatitis C, chronic pain, back injury, and foot surgery.  ECF No. 50, Exs. 1  & 2.

On January 11, 2012, Bruce Ford, P.A. requested podiatric surgery for fusion of Plaintiff's great right toe and removal of a screw in the toe.  ECF No. 44, Ex, 1A, pp. 11-15.  At this time, Plaintiff's regular medications included Naproxen 375 mg three times per day and Neurontin 300 mg two times per day both for pain relief.  Id., p. 18.

Plaintiff was seen by the podiatrist on February 7, 2012, and approved for surgery.  Id., p. 516.  Plaintiff underwent foot surgery on February 14, 2012, which included a first MPJ fusion with internal fixation, and a deep resection of a prior failed internal fusion, right first metatarsal.  Id., pp. 30-35, 520-23, 580-82.  After his surgery he was housed in the ECI infirmary.  Dr. Matera prescribed Percocet 5/325 mg as needed every six hours for 24 hours.  Id., p. 33.

Plaintiff was on "medical hold" with no weight bearing with crutches and instructed to elevate his foot when he laid down or sat.  Id., p. 33.

Plaintiff remained in the infirmary through February 25, 2012, when he was returned to his housing unit via wheelchair.  ECF No. 44, Ex. 1; Ex 1A, pp. 30-99; ECF No. 50, Ex. 1, pp. 1-5.  On March 1, 2012, Plaintiff submitted a sick call slip complaining of back and leg pain and requesting crutches, stating he was without crutches since returning to his cell.  ECF No. 50, Ex. 1, p. 106.   Plaintiff was seen by Bruce Ford, P.A. on March 1, 2012.  He reiterated his complaint that he had not been provided crutches and complained that he had been walking on his foot. Ford ordered crutches for one month.  Id., pp. 6-7.

On March 2, 2012, Ford noted that custody staff refused to permit Plaintiff to use crutches in his cell due to security concerns, and correctional staff advised that Plaintiff should be kept in the infirmary until the issue was resolved.  Correctional Staff advised Ford that the crutches could be kept in "the bubble" on the tier and made available to Plaintiff during out-of-cell activity.  Id., pp. 8-9.  Ford ordered Plaintiff readmitted to the infirmary until the security issue was resolved or until his follow-up appointment with the surgeon could resolve the need for non-weight-bearing status.  Id., pp. 8-9; ECF No. 44, Ex. 1A, pp. 101-10.

Plaintiff was seen by Peter Cuesta, M.D. for his post-operative surgical follow-up on March 8, 2012. ECF No. 50, Ex. 1, pp. 128-30.  Plaintiff was provided a walking cast and advised to bear weight with the cast as tolerated. Weight-bearing activities and exercises were discussed and provided to Plaintiff.  On that same date, Dr. Clem noted that custody would not allow crutches in HU 4.  Id., pp. 10-11.

On March 9, 2012, Clem discharged Plaintiff to HU 4, noting that Plaintiff could ambulate on his walking cast in the cell and crutches would be provided when Plaintiff needed to leave his cell.  Id., p. 12.  Custody was provided instructions regarding Plaintiff's crutches.  Id.

Plaintiff was evaluated by Paul Matera, M.D. on April 12, 2012.  Id., pp. 13-14.  Plaintiff reported that, except for his cast, his foot felt good.  Plaintiff threatened to cut off the cast because he believed his foot was healed.  Matera advised Plaintiff that the cast was due to come off in a few weeks.  Id.  Plaintiff also complained of not receiving medication for his back pain. Matera advised Plaintiff that the pain medication for his foot should work for his back as well. Matera further advised Plaintiff that further evaluation and treatment of his chronic low back pain would be done after the foot issued had resolved.  ECF No. 44, Ex., 1A, pp. 173-74.

Plaintiff was seen for follow up with the podiatric surgeon on May 10, 2012.  He noted that Plaintiff could ambulate to tolerance and the joints had fused.  Id., pp. 513-14, 519.

On June 11, 2012, Plaintiff submitted a sick call slip stating that he needed a slip letting his housing unit know he did not need a wheelchair or crutches.  ECF No. 50, Ex. 1, Id., p. 107. The following day, Plaintiff submitted a sick call slip complaining of pain in his right foot and toes and requesting to be seen by a different surgeon.  Id., p. 108.  Clem approved Tramadol to treat Plaintiff's pain on June 25, 2012.  ECF No. 44, Ex. 1A, pp. 196-99.  On June 29, 2012, Plaintiff reported not receiving the Tramadol and PA Ford reordered Neurontin.  Id., pp. 206-07.

Plaintiff was seen by Jennifer Patterson, R.N. on July 14, 2012, and referred to a physician's assistant for further consultation. ECF No. 50, Ex. 1 Id., p. 15.  Plaintiff was evaluated on July 19, 2012 by P.A. Ford.  Id., pp. 16-17.  Plaintiff advised that he was to be seen

for follow-up regarding his foot surgery.  Ford advised that he would request recommendations and follow-up.  Id.

Plaintiff was again seen by Ford on August 2, 2012, for a chronic case clinic visit related to Plaintiff's asthma and hyperlipidemia.  Plaintiff did not express any complaints regarding his foot or back pain.  Id., pp. 18-22.  Tramadol was renewed.  ECF No. 44, Ex. 1A, pp. 211-12.

On August 5, 2012, Plaintiff submitted a sick call slip complaining of foot pain and requesting to see Dr. Matera.  ECF No. 50, Ex. 1. Id., p. 109.  Plaintiff was seen by Nurse Patterson the following day.  Id., pp. 23-24.  Plaintiff stated that he was to be seen by a specialist because his foot was not healing properly.  Plaintiff complained of pain and stiffness in his "2nd toe."  Patterson noted scarring from the surgery and decreased mobility in the 2nd toe.  She referred Plaintiff for further consultation.  Id.  Plaintiff was seen by P.A. Maryam Messforosh on August 16, 2012, in the chronic care clinic for follow-up care for Plaintiff's hepatitis. Examination showed no signs of pain or joint tenderness.  Id., pp. 25-26.

Plaintiff refused to be seen by a nurse on August 20, 2012.  Id., p. 134.  The following day he submitted a sick call slip asking to see Dr. Matera but did not state a basis for the slip. Id., p. 110.  On August 31, 2012, Plaintiff was seen by P.A. Ford.  Id., pp. 27-28.  Plaintiff requested to see Dr. Matera in order to increase his pain medication.  Ford advised Plaintiff that his pain medications would be maintained at their current levels and likely tapered off in the near future. Ford noted that Plaintiff walked into the examination room without difficulty and displayed no distress or symptoms of pain other than expressing his irritation at not receiving an increase in pain medication.  Plaintiff returned his crutches.  Id.

Plaintiff submitted a sick call slip on September 4, 2012, again requesting to see Dr. Matera.  Plaintiff indicated his belief that Matera would increase his pain medication.  Plaintiff did not indicate he was in pain, only his desire to have the medication increased.  Id., p. 111. The following day Plaintiff refused to be seen by the nurse during his sick call visit.  Id., p. 135.

On September 13, 2012, Plaintiff was seen by P.A. Ford due to Plaintiff's complaints of pain.  Id., pp. 29-32.  Ford noted Plaintiff complained of "vague back pain."  Id.  Ford advised Plaintiff that if one pain medication was increased, another would need to be tapered off and discontinued.  Plaintiff agreed and his Tramadol was increased form 50 mg to 100 mg.  Id.  From September 13, 2012 to January 8, 2013, Plaintiff offered no complaints of back or foot pain other than to request refills of his various medications.  Id., Ex. 2.

On January 10, 2013, Plaintiff was seen by Dr. Matera in response to Plaintiff's sick call slip of the preceding day complaining of back, leg, knee, and foot pain during the night which prevented his sleeping.  Id., pp. 112, 33-34.  Plaintiff stated that he rolled over in his bunk and suffered a spasm in his lumbar spine.  He stated he was stiff ever since but denied weakness or radiating pain. Dr. Matera noted that Plaintiff had a history of lower back pain and herniated disc symptoms from many years ago.  Examination revealed lumbar spasm and slightly decreased range of motion, however, Plaintiff's coordination and gait were stable.  Id., pp. 33-34.  Plaintiff advised that he had been lifting weights for approximately one month.  Plaintiff was advised to refrain from sports and lifting weights and provided warm compresses for his back.  Id.

On February 3, 2013, Plaintiff submitted a sick call slip complaining of back pain interfering with his sleep.  Id., p. 113.  He was seen the following day by JoVonna Osborne, CRNP, in the chronic care clinic for follow-up regarding his asthma, hypertension, neurology,

and for pain management.  Id., pp. 35-37.  Regarding pain management Osborne noted that Plaintiff's pain was addressed on January 10, 2013, during his visit with Dr. Matera.  Plaintiff reported back pain related to an injury from the 1980s and reported he underwent back surgery in 2002.  Plaintiff stated Robaxin helped the pain.  He also reported performing back exercises but stated that the pain had increased over the previous two years.  He reported pain as a ten out of ten and requested an increase in his Neurontin.  Plaintiff was advised to continue taking Naprosyn for pain relief.  Osborne ordered bottom bunk status for one year and continued Plaintiff's medications.  Id.

On February 10, 2013, Plaintiff refused to appear for his scheduled medical appointment. Id., p. 38, 141.  On February 20, 2013, Plaintiff submitted a sick call slip complaining that his right foot was caught in a door by correctional staff and he was in a great deal of pain.  Id., p. 114.  He was seen by Osborne on February 25, 2013 for a chronic care visit due to his hypertension.  Id., pp. 3-40.  Plaintiff requested an increase in his pain medication but did not report additional pain.  He did not mention his foot having been caught in the door a few days earlier.  Osborne did not increase Plaintiff's dosage of Neurontin, and informed Plaintiff that he could not have both Tylenol and Naprosyn refilled.  Plaintiff chose to have the Tylenol refilled. He denied any new concerns or complaints.  Id.

Plaintiff was seen the following day by Terri Davis P.A. in response to his sick call slip of February 20, 2013.  Id., pp. 41-42.  Ice was applied to Plaintiff's foot.  Plaintiff complained of decreased range of motion in his right great toe, which Plaintiff stated was not an issue prior to his foot being caught in the door.  Davis observed no swelling and that Plaintiff walked without a

limp.  Nonetheless, Davis ordered x-rays and directed Plaintiff return for a follow-up visit in two weeks.  Id.

Plaintiff submitted two sick call slips on March 7, 2013.  He complained that his Tylenol and Naprosyn had been cancelled (Id., p. 115) and that when he attempted to pick up a pen, his back gave out and he fell to ground.  He stated he was in great pain.  Id., p. 116.  He was seen by Kimberley Carroll, R.N. on March 10, 2013.   Id., pp. 44-45.  Plaintiff advised that his medications were changed and were less effective.  He noted that when he bent down or squatted he sometimes had difficulty getting back up.  During his examination, Plaintiff had no difficulty ambulating, sitting, standing, twisting at the waist, or turning.  Plaintiff's back was tender and he reported pain with movement.  Sensation was intact and his range of motion was within normal limits.  No weakness, discoloration, tingling, numbness or swelling was observed.  Plaintiff's gait was also normal.  Plaintiff was advised to place a sick call if his symptoms became more severe.  Id.  At the time, Plaintiff was receiving Baclofen, Neurontin, Tylenol Extra Strength and Tramadol for relief of pain and spasms.  ECF No. 44, Ex. 1A, p. 285.

Plaintiff failed to appear for his scheduled appointment on March 12, 2013.  ECF No. 50, Ex. 1, p. 46.  On March 14, 2013, Plaintiff was evaluated by P.A. Ford regarding Plaintiff's request to have his medication refilled.  Id., pp. 47-50.  Plaintiff again requested an increase in his Neurontin.  Plaintiff's Neurontin levels, as reported on his lab work, were low, despite Plaintiff stating he took all of his medication regularly.  Plaintiff was advised that x-rays of an unspecified date showed only old fractures, not new ones.  Plaintiff's prescriptions for Neurontin, Tylenol and Baclofen were renewed.  Id.

Plaintiff was again seen by P.S. Ford on March 19, 2013.  Ford noted that a consultation regarding Plaintiff's foot was being considered and other treatment options were discussed with Plaintiff.  Plaintiff continued to complain of foot pain and reported that the foot was recently slammed in the door.  Id., pp. 51-52.

Plaintiff filed a sick call slip on March 21, 2013, complaining of pain in his foot.  Id., p. 117.  Plaintiff was seen by P.A. Davis on March 28, 2013.  Plaintiff reported a burning pain in his foot over the  last two and a half months.  Plaintiff was advised that his recent x-rays showed no changes.  Davis noted that a consultation request was pending with the podiatrist.  Plaintiff stated that he wanted his toe amputated.  He reported that in 2010, prior to being incarcerated, he injured his back lifting weights.  Plaintiff also stated that his back typically felt fine until noon and then he would take his medication.  Plaintiff was observed to have a normal gait with decreased range of motion in Plaintiff's toes on his right foot.  A follow-up visit was scheduled for one month.  Id., pp. 53-54.

The following day Plaintiff filed a sick call slip complaining of back pain.  Id., p. 118. Plaintiff also reported that P.A. Ford told him that he could receive surgery in Baltimore.[2] Plaintiff was seen on March 30, 2013, by Kathy Killmon, R.N. in response to his complaint of back pain and request for surgery.  Id., p. 55.  Killmon referred Plaintiff to a physician's assistant for further evaluation.  Id.

Plaintiff was seen by P.A. Ford on April 9, 2013, due to his complaint of chronic back pain.  Id., pp. 56-59.  Plaintiff reported no improvement.  Ford increased Plaintiff's Neurontin.

---

[2] Clem and Ford had discussed further consultation with the surgeon regarding Plaintiff's ongoing foot problems. ECF No. 44, Ex. 2, p. 14.

No tenderness or deformity in Plaintiff's musculoskeletal system was observed.  Plaintiff was directed to refrain from playing sports or lifting weights.  Id.

Plaintiff requested refills of his pain medications on April 18 and 22, 2013.  Id., p. 119. Plaintiff was seen by P.A. Davis on April 23, 2013, due to his continued complaints of back pain. Id., pp. 60-61.  Plaintiff complained of right leg pain from his knee down and on the left side from his buttock to his foot.  He stated that the pain caused him to wake in the night and that the pain was related a motorcycle accident.  Plaintiff's most recent x-ray of his lumbar spine, taken in July of 2011, showed retrolisthesis (displacement of one vertebral body with respect to anther to a degree less than dislocation) and anterior osteophytes (bone spurs which are indicative of spinal degeneration)  See ECF No. 50, p. 13.  New x-rays were ordered.  Id., Ex. 1, pp. 60-61. Plaintiff complained that rotating to his right caused shooting pain down his hip to his calf and rotating to the left caused a burning sensation in his buttock.  Plaintiff stated that posterior flexion hurt and caused sharp pain when he returned to a standing position.  He was able to touch his toes but complained of pain bilaterally in the buttocks when he returned to a standing position. L ying flat and crossing Plaintiff's right leg over his left caused Plaintiff pain.  Crossing his left leg over his right caused pain in the center of his spine.  Plaintiff moved easily between sitting and standing positions.  He also moved easily from standing to prone position without signs of keeping his back in a less painful position.  He was advised to continue stretching exercises.  He was advised that the goal was to wean him from Ultram and continue the Neurontin.  Plaintiff expressed dissatisfaction with the plan of treatment and stated he would write a complaint.  Davis noted that Plaintiff's stated degree of pain did not correlate with her objective findings.  He was scheduled for a follow-up visit in two weeks.  Id.  That same day he

filed a sick call slip complaining that Davis refused to reorder his Ultram until the result of his x-rays was obtained.  Id., p. 120.

Plaintiff was seen by Nurse Patterson on April 25, 2013, due to his complaints of pain. Id., pp. 62-65.  It was noted that Plaintiff was agitated and angry that he had been taken off Ultram and he demanded an explanation.  He also demanded to see Dr. Matera.  Plaintiff was advised that the provider was waiting the result of the x-rays to make a determination on his plan of treatment.  Id.

Plaintiff was seen by Nurse Osborne in the chronic care clinic on April 29, 2013, for his asthma, hypertension and chronic pain.  Id., pp. 66-68.  It was noted that Plaintiff was recently seen for pain management on April 9 and 23, 2013.  It was also noted that on April 9, 2013, his Neurontin was increased and on April 23, 2013, the Ultram was discontinued.  Plaintiff reiterated his discontent with the discontinuation of his Ultram.  Plaintiff was advised that Osborne could not renew the Ultram or increase the Neurontin at that time.  Plaintiff walked into the examination room and sat in the chair without notable difficulty.  Plaintiff was continued on his current pain management program and advised to continue his stretching exercises.  Id.  Plaintiff filed a sick call slip the following day again requesting the Ultram be renewed and noting his x-rays were now "in the system."  Id., p. 121.

Plaintiff was seen by P.A. Ford on May 3, 2013, to review his x-rays.  A slipped disc was observed and Plaintiff's Ultram was renewed.  No other increase in medication was indicated. Id., pp. 69-72.  Ford noted that Plaintiff's Neurontin would be tapered off at a later date.  That day, Ford submitted a non-formulary drug request for Ultram for two 50 mg tables, crushed, for 90 days.  Id.

On May 22, 2013, Plaintiff submitted a sick call slip complaining that he had not been seen regarding his x-rays.  Id., p. 122.  On May 25, 2013. Plaintiff was seen by P.A. Ford regarding Plaintiff's complaint of left knee pain.  Plaintiff also complained about the crush and float order-wherein he received the Ultram crushed and floated in water rather than in a tablet form.   P.A. Ford ordered new x-rays and indicated that additional medications were not indicated.  Plaintiff's musculoskeletal system revealed no tenderness or deformities and Plaintiff had a full range of motion.  Id., pp. 73-76.

Plaintiff was transferred from ECI to MCI-H on July 11, 2013.  Id., pp. 79-83.  Upon intake at MCI-H his medications were reviewed and renewed.  Id., pp. 79-83.  Plaintiff filed a sick call slip on July 16, 2013, seeking medications and complaining of back pain.  He also claimed he had been provided a cane at ECI and requested one be provided to him.[3]  Id., p. 123. He was seen by Purcell Bailey, M.D. in the chronic care clinic on July 30, 2013, for review of Plaintiff's asthma, chronic pain, hypercholesterolemia, and Hepatitis C.  Id. pp. 84-89.  Bailey ordered Plaintiff's pain medication increased.  Id.  The following day Plaintiff refused to be seen for his nurse sick call visit.  Id., p. 144.

On August 13, 2013, Plaintiff filed a sick call slip complaining of back pain and spasms. He stated that he fell as a result of same.  Id., p. 124.  Plaintiff again requested he be provided a cane.  Id.  He was seen that day by Nurse Kinney.  Id., pp. 90-92.  Kinney referred Plaintiff to a provider for further evaluation.  Id.

On August 29, 2013, Plaintiff was seen by Dr. Bailey in the chronic care clinic.  Id., p. 93-95.  Bailey noted Plaintiff's history of lumbar surgery in 2002 and constant pain from the

---

[3] There is no indication in the medical records that Plaintiff was ever provided a cane at ECI.

waist down and that Plaintiff reported he had fallen.  Bailey noted Plaintiff had a decreased range of motion in his lumbar spine and left shoulder.  He was given an order to be cuffed in front.  Id.

Plaintiff filed a sick call slip on September 13, 2013, complaining that he had fallen three times that week and his condition was worsening.  Id., p. 126.  He was seen on September 15, 2013, by Cynthia Martin R.N.  Id., pp. 96-98.  Plaintiff walked into the medical room on his own without notable difficulty.  He reiterated his complaint of increased episodes of falling due to his legs giving out.  He reported that his pain was ten out of ten and radiated to both legs. Plaintiff stated that he could not sit, stand, or lay any one position for more than thirty minutes. Id. "[Plaintiff] state[d] he did fall from a roof years ago along with being hit by a car when he committed (sic) his crime."  Id.  Plaintiff was provided a warm compress and referred for further evaluation.  Id.

Plaintiff was evaluated by Cynthia Shump, R.N.P. on September 24, 2014, in response to his complaint of chronic pain.  Id., pp. 99-100.  He again stated his leg had been giving out when he went from a prone position to a standing position and reported it was getting worse.  He reported the pain was sharp and radiated down his legs.  Id.  Shump reviewed Plaintiff's history noting that: in the 1980s Plaintiff was involved in a motorcycle accident; in 2002 Plaintiff was hit by a car and had surgery on his lumbar spine; in 2010 Plaintiff had a 100 lb. dumbbell land on his foot shattering it; and an x-ray taken on April 13, 2012, showed Plaintiff suffered from disc degeneration and a slipped disc.  Plaintiff was continued on his current management program. Id.

Plaintiff filed a sick call slip on October 5, 2013, complaining of back pain but reported that he was no longer falling.  He refused to be seen by the Nurse on October 7, 2013.  Id., pp.

126-27.  He was evaluated by Travis Stevens, R.N. on October 14, 2013 due to  a sick call slip filed on October 13, 2013.  Plaintiff complained of back pain and pain in his knees.  Id., pp. 101-03.  Stevens referred Plaintiff to a provider for further evaluation, however Plaintiff refused to be seen on October 16, 2013.  Id., p. 148.

Plaintiff was again seen by Shump on October 22, 2013, due to his complaint of continued back pain.  Plaintiff stated that the pain was so bad he had difficulty sleeping and felt like his knees were going to give out.  An MRI of Plaintiff's lumbar and sacral spine and x-rays were ordered.  Id., pp. 104-05.  Plaintiff was sent to Bon Secours Health Systems for an MRI on November 26, 2013.  ECF No. 49, pp. 2-3.  The MRI revealed Plaintiff suffered from arthritis of the spine, a bulging disc, and a slipped disc.  Id., ECF No. 50, Ex. 1, p. 19.  Plaintiff is seen regularly by medical personnel as a chronic care clinic and can be seen more immediately through the use of the prison sick call system.  ECF No. 50, Ex. 2.

Dr. Clem avers that Plaintiff was not caused any injury due to the treatment provided at ECI for Plaintiff's foot problems or his longstanding lower back injury.  Clem further avers that no injury was caused by the failure to obtain MRIs or other diagnostic testing at an early date.  Clem avers that an MRI was not medically required during Plaintiff's incarceration at ECI and that an MRI is not medically indicated for patients in whom the result would not alter the treatment.  Clem avers that most spinal conditions can be diagnosed by obtaining the patient's medical history and physical examination.  He further indicates that most patients respond to conservative treatment.  ECF No. 44, Ex. 1.

## Standard of Review

A.      <u>Motion to Dismiss</u>

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b) (6) is to test the sufficiency of the plaintiff's complaint.  <u>See</u> <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999).   The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  <u>See</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 561-62 (2007).   Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.  <u>Id.</u> at 562.  The court need not, however, accept unsupported legal allegations, <u>see</u> <u>Revene v. Charles County Comm'rs</u>, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, <u>see</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, <u>see</u> <u>United Black Firefighters v. Hirst</u>, 604 F.2d 844, 847 (4th Cir. 1979).

In reviewing the complaint in light of a motion to dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6) the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff.  <u>See</u> <u>Venkatraman v. REI Sys., Inc.</u>, 417 F.3d 418, 420 (4th Cir. 2005); <u>Ibarra v. United States</u>, 120 F.3d 472, 473 (4th Cir. 1997); <u>Mylan Labs., Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir. 1993). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."    <u>Migdal v. Rowe Price-Fleming Int'l Inc.</u>, 248 F.3d 321, 325-26 (4th Cir. 2001); <u>see also</u> <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule

8(a)).

The Supreme Court of the United States explained a "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal citations omitted).   Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss.  Id.  Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  Id. at 563.  Thus, a complaint need only state "enough facts to state a claim to relief that is plausible on its face."  Id. at 570.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (Twombly, 550 U.S. at 570).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' "  Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

B.     Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Bouchat, 346 F.3d at 526 (quoting Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993)) (internal quotation marks omitted).

In Anderson, the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." 477 U.S. at 248.

Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." Id. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact.  No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

**Analysis**

A.  Supervisory Liability

Plaintiff's Complaint against Kathleen Green and Corizon  is based solely upon the doctrine of  respondeat superior, which does not apply in § 1983 claims.  See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Liability of supervisory officials must be "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F. 3d 228, 235 (4th Cir. 2001) (citing Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability must be supported with evidence that (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff, (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

20

See <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994).  Plaintiff has pointed to no action or inaction on the part of Kathleen Green or Corizon that resulted in a constitutional injury, and accordingly, his claims against Green and Corizon shall be dismissed.

B. <u>Wexford Health Sources, Inc.</u>

At the time of the events complained of, Wexford Health Sources, Inc. served solely as the utilization review management provider for the Department of Public Safety and Correctional Services.  ECF No. 25, Ex. 1.  During the time at issue, Wexford did not provide primary health care to inmates and was not responsible for providing medical recommendations regarding whether it was medically necessary for Plaintiff to receive crutches to assist his ambulating in his cell nor did Wexford make any security decisions regarding the use of crutches in his cell.  <u>Id.</u> As such, Plaintiff's claim against Wexford Health Sources, Inc. is subject to dismissal.

C. <u>Medical Claim</u>

As interpreted by the Supreme Court, the Eighth Amendment prohibits "unnecessary and wanton infliction of pain."  <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  <u>De'Lonta v. Angelone</u>, 330 F.3d 630, 633 (4th Cir. 2003).  In the context of denial of medical care, an Eighth Amendment violation arises when the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. See <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-06 (1976).  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available.  See <u>Farmer v. Brennan</u>, 511

U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious.  See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (explaining that society does not expect that prisoners will be provided with unqualified access to health care).  Proof of an objectively serious medical condition, however, does not end the inquiry.  The subjective component requires "subjective recklessness" in the face of the serious medical condition.  See Farmer, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."  Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997).  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment."  Brice v. Va. Beach Corr.  Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (citations and internal quotation marks omitted).  If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted."  Farmer, 511 U.S. at 844.  The reasonableness of the defendant's actions taken must be judged in light of the risk that he knew.  Brow v. Harris, 240 F.3d 383, 390 (4th Cir. 2001).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference."  Johnson v. Quinones, 145 F.3d 164, 166 (4th Cir. 1998).  Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge requirement is not met.  Id. at 169 (reasoning that actions inconsistent with an effort to hide a serious medical condition refute the presence of subjective knowledge).  Mere disagreement with a prescribed course of treatment

is insufficient to establish an Eighth Amendment claim of deliberate indifference.  See Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (concluding that, where a prisoner was under constant medical supervision, his claims did not rise to the level of deliberate indifference).

Dr. Clem avers that Plaintiff was not caused any injury by the treatment rendered at ECI for his foot and lower back.  After his foot surgery, Plaintiff was provided a number of accommodations including admission to the infirmary, a cell on a lower tier, crutches for use outside of his cell, a walking boot, pain medication, bed rest, feed-in orders, and regular and repeated follow-up care with medical providers.  ECF No. 44, Ex. 1A, pp. 96-98, 107-10, 142-43, 148-50, 153, 169-70, 206-07, 530-31.  Plaintiff was provided regular assessment, care, and treatment of his foot injury and his degenerative disc condition in his lower back.  Id.  He was not harmed by the refusal to provide him crutches in his cell.  Id., Ex. 1.  Dr. Clem avers that there is no credible medical evidence to support Plaintiff's contention that his back condition developed or worsened due to his having to hop around in his cell for one week after foot surgery and/or due to his having to use a walking cast after the surgery.  ECF No. 44, Ex. 1.

Plaintiff's medical records demonstrate that his lower back pain was a longstanding condition caused by a motor vehicle accident in the 1980s.  Plaintiff's back pain was further exacerbated over time by back spasms after rolling over in his bunk, weight lifting, jogging, an automobile accident in 2002, falls due to lost leg control, changes in gait due to foot surgeries, degenerative changes progressing over time, and old surgeries, including lumbar spinal surgery.  ECF No. 44, Ex. 1A, pp. 173-74, 260-62, 294-95, 301-04, 387-88, 401-02, 449-50, 452.  Plaintiff's back problems stem from long before his foot injury and there is simply no evidence to support his contention that the worsening of his back condition was caused by the lack of

crutches.  Plaintiff's mere disagreement with the prescribed course of treatment is insufficient to establish an Eighth Amendment claim of deliberate indifference.  See Russell, 528 F.2d at 319.

Further, even if Plaintiff could demonstrate injury as the result of a causal connection between the worsening of his back condition and the denial of the use of crutches, such a claim, at most, would state a claim for negligence.  He has failed to demonstrate that any of the named Defendants, correctional or medical, were deliberately indifferent to his serious medical need.  Rather, correctional defendants denied the use of crutches due to security concerns on the disciplinary segregation unit to which Plaintiff was assigned.  Plaintiff was confined in an 11' x 7' cell, where the sink and toilet were no more than 2.5 feet from his bunk, for one week.  It was reasonable for correctional staff to believe he could navigate the cell without causing injury to himself.  Plaintiff, rather than submit sick call slips regarding the crutches, complained to the pill call nurses who had no authority to take any action regarding the crutches.   Once Plaintiff notified the appropriate medical staff of the difficulty he was having in his cell, he was returned to the infirmary where his use of crutches did not create a security concern until he returned to his surgeon who provided a walking cast.   Thereafter, Plaintiff's physicians signed off on his being housed in a cell without crutches.

Lastly, Plaintiff's claim that he was denied constitutionally adequate medical care for his long standing back problems is belied by the record.  Plaintiff was regularly seen by medical staff.  Diagnostic testing was completed including, the taking of Plaintiff's medical history, physical examination, x-rays, and MRIs.  A conservative course of treatment was developed with therapeutic exercises, warm compresses,  and a variety of analgesic medication, including formulary and non-formulary medications were prescribed.  Plaintiff was provided a number of

24

accommodations to reduce his back strain including bottom bunk status, no work status, feed-in status, and cuff-in front status.   There is no evidence that Plaintiff's care plan would have differed had he been provided an MRI at an earlier date.  In fact Plaintiff's care since the MRI has remained essentially unchanged, i.e. a conservative course of treatment consisting of exercises and analgesic medication.  ECF No. 50, Ex. 2.  Plaintiff's disagreement with the prescribed course of treatment is insufficient to establish an Eighth Amendment claim.  See Russell, 528 F.2d at 319.

   D.  Conditions

   To the extent Plaintiff's Complaint is construed as raising a claim that being housed in a cell without his crutches constituted unconstitutional conditions of confinement, his claim fails. Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment.   Rhodes v. Chapman, 452 U.S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society."  Id.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'

Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original) (citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'"  Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008) (citing Wilson v. Seiter, 501 U.S. 294, 298-300 (1991)).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded. See Wilson, 501 U.S. at 298. In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." Brown v. N.C. Dep't of Corr., 612 F.3d 720, 723 (4th Cir. 2010) (quoting Case v. Ahitow, 301 F.3d 605, 607 (7th Cir. 2002)). Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law. See Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir.1993). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." De'Lonta, 330 F.3d at 634. Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of a serious or significant physical or emotional injury resulting from the challenged conditions. See Odom v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003).

Defendants' actions are not actionable unless, "in light of preexisting law the unlawfulness of those actions is apparent." Iko, 535 F.3d at 238 (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "We do not require of such officials the legal knowledge culled by the collective hindsight of skilled lawyers and learned judges, but instead only the legal knowledge of an objectively reasonable official in similar circumstances at the time of the

challenged conduct." Johnson v. Caudill, 475 F.3d 645, 650 (4th Cir. 2007).

In the instant case there was no bright line crossed by Correctional Defendants in denying Plaintiff use of the crutches in his cell. The conditions as described by Plaintiff were not so severe that Defendants could be charged with "fair warning that their conduct was unconstitutional." Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 2929, 313 (4th Cir. 2006). The discomforts experienced by Plaintiff in being housed in a cell without crutches for approximately one week are noted by the Court, but they did not impose cruel and unusual punishment on Plaintiff. This conclusion is supported by the absence of proof of significant, serious physical or psychological injury resulting from Plaintiff's brief denial of crutches in his cell.

### Conclusion

For the aforementioned reasons, Defendants' dispositive motions, construed as Motions for Summary Judgment, shall be granted.[4]   A separate Order follows.

August 22, 2014                                                    /s/
                                                    _____
                                                    George L. Russell, III
                                                    United States District Judge

---

[4] Having found no constitutional violation, the Court need not address Defendants' qualified immunity claim.